```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

M & S PARTNERS,

    Plaintiff

v.                              Civil Action No. 2:04-1221

SCOTTSDALE INSURANCE COMPANY,
an Ohio corporation,

    Defendant

## MEMORANDUM OPINION AND ORDER

Pending is a renewed motion for application of Virginia substantive law and for partial summary judgment, filed September 6, 2005, by defendant Scottsdale Insurance Company ("Scottsdale").[1]

I.

Plaintiff is a New York partnership whose members reside within that state. (Compl. ¶ 1). Scottsdale is an Ohio corporation. (Id. ¶ 2.) Plaintiff does not challenge Scottsdale's recitation of the facts. The court thus summarizes Scottsdale's version of the events, with some additional elaboration where necessary to provide context.

---

[1] The final document relating to the pending motion was filed by Scottsdale on November 21, 2005.

This case arises from an underlying action previously filed in this court. M & S Partners v. Sandcastle Corp., 2:00-0981 (S.D. W. Va. Oct. 18, 2000) ("underlying action"); (Def.'s Memo. in Supp. at 1). The underlying action apparently arose out of two Residential Monitoring Receivable Financing Agreements ("Financing Agreements"). The Finacing Agreements were entered into between plaintiff and Sandcastle Corporation, d/b/a Southern Security System ("Sandcastle"), at the time a Virginia corporation. (Compl. ¶ 5); (Underlying action am. compl.). Sandcastle ultimately defaulted on its repayment obligation, resulting in the underlying action. (Compl. ¶ 8). One component of the underlying action was that, at the time the Financing Agreements were entered, Sandcastle promised that it did not have any claims then pending against it that might result in liability greater than $10,000. (Underlying action am. compl. ¶ 12). In actuality, however, Sandcastle was being sued at the time in the Circuit Court of Kanawha County by another entity for in excess of that amount. (Id. ¶¶ 13-15).

When the underlying action was instituted, Sandcastle was insured by Scottsdale under a commercial general liability policy. (Def.'s Memo. in Supp. at 2). The claims initially set forth in the complaint were for actions that were, according to

Scottsdale, "deliberate or willful in nature." (<u>Id.</u>) Scottsdale denied coverage as a result. (<u>Id.</u>)

A short time after that denial, plaintiff amended the complaint in the underlying action to include other, negligence-based claims against certain corporate officers and directors of Sandcastle. (<u>Id.</u>) The underlying case was ultimately resolved by the dismissal of the three individual defendants and the entry of an October 3, 2003, default judgment against Sandcastle in the amount of $508,054.93. (<u>Id.</u>)

On October 1, 2004, plaintiff instituted this action in the Circuit Court of Kanawha County. (Compl.) The complaint makes the following allegation:

> 11. Although its insured's liability to M & S was manifest and coverage under the CGL policy readily apparent, Scottsdale engaged in unfair claim settlement practices within the meaning of . . . West Virginia's Unfair Trade Practices Act [(WVUTPA)]. . . and the rules and regulations promulgated thereunder, violating the specific provisions of W. Va. Code § 33-11-4(9).

(<u>Id.</u> ¶ 11). On November 12, 2004, Scottsdale removed. On August 24, 2005, the court granted the parties' "joint motion to amend case management protocol." <u>M & S Partners v. Scottsdale Ins. Co.</u>, No. 2:04-1221, slip op. at 1 (S.D. W. Va. Aug. 24, 2005). The referenced order provided pertinently as follows:

> That plaintiff's complaint . . . is . . . construed as

3

> asserting from the date of filing (1) a claim against defendant pursuant to <u>Robinson v. Cabell Huntington Hosp., Inc.</u>, 201 W. Va. 455, 498 S.E.2d 27, (1997), to recover the amount of the default judgment in <u>M & S Partners v. Sandcastle Corp.</u>, No. 2:00-0981 (S.D. W. Va. Oct. 3, 2003); and (2) a claim against defendant for unfair insurance claim settlement practices pursuant to the West Virginia Unfair Trade Practices Act . . . .

<u>Id.</u> slip op. at 1-2.[2]

Scottsdale contends that Virginia law governs all questions relating to both coverage[3] and insurer malfeasance.

---

[2] The <u>Robinson</u> claim appears to be based upon that decision's recognition of the following rule:

> In West Virginia . . . there are circumstances in which an injured plaintiff can bring a direct action against a liability insurer. . . . [T]his Court [has] stated '[i]f an insured with coverage under a liability insurance policy does not pay the underlying judgment entered in a personal injury action, the injured plaintiff may institute a direct action against the insurance company to recover the amount of the judgment up to the limits of the policy.'

<u>Robinson</u>, 201 W. Va. at 460, 498 S.E.2d at 32 (citation omitted).

[3] The court declines to rule presently on this particular issue for two reasons. First, it appears plaintiff has misunderstood Scottsdale's position on the point. Although defendant contended in its opening brief that questions of coverage should be resolved with reference to Virginia law, plaintiff states in its response that "Scottsdale's position that West Virginia law governs the coverage dispute is understandable . . . ." (Pl.'s Resp. at 5). As a result of this misapprehension, the issue was not joined in the briefing. Second, the driving force behind a conflicts analysis is that the laws of two or more sovereigns differ on a particular legal

(continued...)

Plaintiff counters that West Virginia law applies, in that "the parties' operations in West Virginia engendered the conduct ultimately giving rise to the claims asserted." (Pl.'s Resp. at 2).

## II.

The choice-of-law analysis proceeds in four, orderly steps.  First, the court must ascertain the juridical nature of plaintiff's claim.  Second, the court must compare Virginia and West Virginia law to ascertain whether a conflict exists.  Third, if a conflict exists, the court will examine the choice-of-law rules applicable in the forum state.  Finally, the court will apply the applicable rules and determine which law governs the dispute.

---

[3](...continued)
question.  Neither party here, however, has suggested that such a conflict is present on any coverage issues.  The court, accordingly, confines its conflicts analysis to the applicable law governing the allegation of insurer malfeasance.

### 1. The Juridical Nature of the Claim

The relevant section of the WVUTPA is found in West Virginia Code section 33-11-4(9).  Section 33-11-4(9) lists a host of unfair claim settlement practices.  The parties initially dispute the nature of a WVUTPA claim under section 33-11-4(9).  Scottsdale asserts the claim arises in contract.  Plaintiff contends it has alleged a tort.  Plaintiff is correct:

> We first address the nature of a claim brought under
> the Act. While Plaintiffs contend that unfair
> settlement claims are contractual in nature, this Court
> made clear in Poling v. Motorists Mutual Insurance Co.,
> 192 W.Va. 46, 450 S.E.2d 635 (1994), that a
> "[v]iolation of ... [the Act] is tortious conduct." Id.
> at 49, 450 S.E.2d at 638.

Wilt v. State Auto. Mut. Ins. Co., 203 W. Va. 165, 166, 506 S.E.2d 608, 609 (1998); Poling v. Motorists Mut. Ins. Co., 192 W.Va. 46, 49, 450 S.E.2d 635, 638 (1994); cf. State of West Virginia ex rel. Allstate Ins. Co. v. Madden, 215 W. Va. 705, 725, 601 S.E.2d 25, 45 (2004) ("Under modern insurance law, bad faith in the resolution of an insurance claim is recognized as tortious in nature.").  Plaintiff's UTPA allegations are thus properly viewed as a tort claim.

## 2. A Comparison of Virginia and West Virginia Law

If a conflict does not exist between the competing bodies of substantive law, the analysis ends.  The parties here, however, concur that West Virginia provides a statutory bad faith remedy without equal in Virginia.  (Pl.'s Resp. at 2 ("If Virginia law governs the legitimacy of Scottsdale's conduct, then it is entitled to partial summary judgment with respect to the UTPA claim, leaving only the Robinson[1] claim for coverage to be adjudicated by the Court."); Def.'s Memo. in Supp. at 14 ("Virginia does not recognize a private cause of action for unfair trade practices in insurance."))  A conflict is thus apparent.

## 3. The Applicable Choice-of-Law Rules

Our court of appeals observed recently the well-settled rule governing a choice-of-law inquiry in the diversity context:

> A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (observing that forum state's choice-of-law rules are substantive).

7

Volvo Const. Eqpt. N. Am, Inc. v. CLM Eqpt. Co. Inc., 386 F.3d 581, 599-600 (4th Cir. 2004).

The supreme court of appeals has exhibited a distinct preference for the doctrine of lex loci delicti in choosing the applicable law for tort actions. One respected commentator on conflict of laws in West Virginia observed some time ago as follows: "A number of states, including West Virginia, still adhere wholly or partially to a doctrine for deciding conflict of laws cases that is rooted in nineteenth century legal conceptualism." James Audley McLaughlin, Conflict of Laws: The Choice of Law Lex Loci Doctrine, the Beguiling Appeal of a Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 957-58 (1991). The same observation is true today. See, syl. pt. 1, State of West Virginia ex rel. Chemtall Inc. v. Madden, No. 31743, 216 W. Va. 443, 447, 607 S.E.2d 772, 776 (2004) ("'In general, this State adheres to the conflicts of law doctrine of lex loci delicti.' Syllabus Point 1, Paul v. National Life, 177 W.Va. 427, 352 S.E.2d 550 (1986).").

Despite this strong preference for the ancient rule, the supreme court of appeals has exhibited a flexible approach at times:

> Although in the past we have been critical of the fuzzy

8

> standards set forth in the Restatement (Second) of Conflicts, . . . we have, nonetheless, on appropriate occasions repaired to the standards set forth in the Restatement <u>to resolve particularly thorny conflicts problems</u>. <u>See</u>, <u>e.g.</u>, <u>New v. Tac & C Energy, Inc.</u>, 177 W.Va. 648, 355 S.E.2d 629 (1987).

<u>Oakes v. Oxygen Therapy Servs.</u>, 178 W. Va. 543, 544-45, 363 S.E.2d 130, 131-32 (1987) (emphasis supplied) ("The case before us is sufficiently complex because of the relationship between the Maryland contract and appellant's tort theory that the Restatement standards provide useful guidance.").

Similarly complex issues are present here. Although the <u>lex loci</u> doctrine is well-suited for use when tangible personal injuries are present, the rather esoteric nature of the harm here, along with the locus of where it was inflicted, illustrates the ancient rule is unsuitable. Inasmuch as this perceived complexity exists, the court will utilize the conflict-of-laws analysis found in the Restatement (Second) of Conflict of Laws (1971) ("Restatement").

The applicable rules are found in sections 6 and 145 of the Restatement. The section 6 factors are as follows:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states

>   and the relative interests of those states in the determination of the particular issue,
>
>   (d) the protection of justified expectations,
>
>   (e) the basic policies underlying the particular field of law,
>
>   (f) certainty, predictability and uniformity of result, and
>
>   (g) ease in the determination and application of the law to be applied.

Restatement § 6(2)(a)-(g).

The section 145 contacts, designed to help illuminate the section 6 inquiry, are as follows:

>   (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>       (a) the place where the injury occurred,
>
>       (b) the place where the conduct causing the injury occurred,
>
>       (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
>       (d) the place where the relationship, if any, between the parties is centered.
>
>   These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Id. § 145.

**4.   Application of the Restatement Rules**

A natural starting point for application of the Restatement rules would be an examination of prior, similar precedent where the rules were applied.  Accordingly, the court has reviewed a number of cases involving statutory unfair trade practice and statutory and common-law bad faith actions where choice-of-law issues have arisen.  See, e.g., Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1 (1st Cir. 1994); Lange v. Penn Mut. Life Ins. Co., 843 F.2d 1175 (9th Cir. 1988); Molzahn v. Allstate Ins. Co., 305 F. Supp.2d 1113 (D. N.D. 2004); Kilmer v. Connecticut Indemn. Co., 189 F. Supp.2d 237 (M.D. Pa. 2002); Jackson v. Travelers Ins. Co., 26 F. Supp.2d 1153 (S.D. Iowa 1998); Adams v. Rubin, 964 F. Supp. 507 (D. Me. 1997); Teachers Ins. Co. v. Berry, 901 F. Supp. 322 (N.D. Fla. 1995); York v. Globe Life and Acc. Ins. Co., 734 F. Supp. 340 (C.D. Ill. 1990); York v. Globe Life and Acc. Ins. Co., 734 F. Supp. 340 (C.D. Ill. 1990); American Home Assur. Co. v. Libbey-Owens-Ford Co., 588 F. Supp. 764 (Mass. 1984);  Bates v. Superior Court, 749 P.2d 1367 (Ariz. 1988); Zimmerman v. Allstate Ins. Co., 224 Cal. Rptr. 917 (Cal. Ct. App. 1986); Ranger v. Fortune Ins. Co., 881 P.2d 394 (Colo. App. 1994).

Unfortunately, the case law is of little assistance for a variety of reasons.  First, several cases utilize tests distinct from the Restatement analysis.  Second, some courts engage in a contract analysis for bad faith claims rather than the tort analysis applicable here.  Third, few if any cases involve a private, third-party, statutory bad faith cause of action, as few jurisdictions have adopted that species of claim.  Fourth, and most importantly, the facts in the cited cases are distinguishable in many respects from those presented here.

In view of this, the court proceeds directly to applying the Restatement rules to the facts adduced by the parties in order to determine whether Virginia or West Virginia has the most significant relationship to the WVUTPA claim and the parties.

    i.   The Section 145 Contacts

From plaintiff's perspective, Scottsdale's putative misconduct occurred in this state when it failed to fully defend and indemnify Sandcastle in the underlying action.  The effects of that injury though were felt in New York, plaintiff's place of residence.  This contact, then, could provide only minimal

support for applying West Virginia law.[4]

The second contact favors neither West Virginia nor Virginia law, as the conduct causing the injury apparently emanated from Arizona, Scottsdale's apparent principal place of business.  The claim was presumably handled in large measure there.

The third contact requires an examination of the parties' geographic locations.  Again, plaintiff resides in New York.  Scottsdale is an Ohio citizen.  As noted below, however, these two entities conducted no business with each other.  On the other hand, Sandcastle, the entity with whom both conducted commercial activity, resided in Virginia.  Hence, one must factor into the analysis that the place of business was Virginia.  For example, the Financing Agreements entered into between plaintiff and Sandcastle that resulted in the underlying action, and this case, have an exceptionally strong connection with that state.  Further, because plaintiff complains primarily of a financial injury, and that injury has its roots in a Virginia commercial

---

[4]This contact also provides some support for application of New York jurisprudence, although neither party has otherwise suggested application of that sovereign's laws.  (See Pl.'s Resp. at 4 ("Of course, neither New York nor Arizona is West Virginia or Virginia, the sovereigns to whose laws the parties have urged this Court's attention.")).

transaction, that locale is entitled to significant weight.  See id. (stating "When the interest affected is a personal one such as a person's interest in his reputation, or in his right of privacy or in the affections of his wife, domicil, residence and nationality are of greater importance than if the interest is a business or financial one, such as in the case of unfair competition, interference with contractual relations or trade disparagement.  In these latter instances, the place of business is the more important contact.") (emphasis supplied).

Finally, the court must ascertain the place where the relationship, if any, between the parties is centered.  As noted, it does not appear plaintiff and Scottsdale developed any significant relationship.  Scottsdale, an Ohio citizen, and plaintiff, a New York partnership, met fortuitously in this state as a result of a discrete piece of civil litigation filed in this district.  As noted though, the relationship between Scottsdale and Sandcastle was plainly centered in Virginia.

Scottsdale makes the following representations concerning its dealings with Sandcastle:

> First, the insurance contract in question was negotiated and entered into in Virginia.  The insured, Sandcastle Corporation . . . was at the time of formation, a corporation that existed under the laws of Virginia, and headquartered in Manassas, Virginia.

14

> Sandcastle's insurance agent, the Harris Agency, was also located in Manassas, Virginia. Second, the place of negotiation was also Virginia for the same reasons. At the time of formation, Sandcastle represented to Scottsdale that it conducted business in Virginia and Maryland, with no reference to business being conducted in West Virginia. Third, the place of performance of the contract was Virginia, with any claims on Sandcastle's insurance policy being paid out from Arizona.
>
> Furthermore, the representations made by Sandcastle, which caused the underlying action to be brought on by M&S Partners, were made by its designated representatives during the course of discussions between the Plaintiff and Sandcastle prior to entering into a financial agreement.[] These discussions would have occurred between M&S Partners in New York and Sandcastle's representatives, headquartered in Virginia. The agreement itself was also entered into by P.K. Spencer, on behalf of Sandcastle, in Virginia.

(Def.'s Memo. in Supp. at 6-7) (citations omitted). This final contact, then, appears to weigh in favor of applying Virginia law.

   ii.   The Section 6 Factors

The court first examines the needs of the interstate system. The Restatement commentary provides that "[c]hoice of law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them." Restatement § 6 comment. Although West Virginia and Virginia have reached opposite conclusions regarding the

15

existence of a private right of action under their respective laws governing insurer malfeasance, there is no indication the choice between either will cause significant friction between the sovereigns.  In sum, there are no overriding needs of the interstate legal system implicated in this case.

Next, the court examines the relevant policies of the forum and other interested states.  It is clear West Virginia has an interest in "regulat[ing] trade practices in the business of insurance[.]"  W. Va. Code § 33-11-1.  It has done so, in part, "by defining . . . all . . . practices in th[e] State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined."  Id.  As noted though, plaintiff is not a West Virginia citizen.  Virginia likewise has enacted laws to protect its citizens, like Sandcastle, from unscrupulous insurer misconduct.  Although Sandcastle is not a party, its failure to pay the judgment against it was a likely progenitor of this action, along with the Virginia-based insurance policy upon which Scottsdale's obligation to it was premised.  Sandcastle's link with this case is thus beyond question.  Virginia's policies for punishing insurer malfeasance have a significant role to play here.

16

Next, the court analyzes the protection of justified expectations. The Restatement commentary provides as follows:

> There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question.

Restatement § 6 comment. One can say with some level of certainty that plaintiff and Sandcastle gave not a moment's consideration to the WVUTPA when they entered into their contractual relationship. One can further say, with near absolute confidence, that in entering into a contract of insurance with Sandcastle, Scottsdale had no expectation of later being called to account under the WVUTPA as a result. These considerations militate against the application of West Virginia law.

The court considers the remaining factors to be neutral. The analysis does not end there though. The commentary recognizes other considerations may play into the analysis. <u>Id.</u> ("It is not suggested that this list of factors is exclusive. Undoubtedly, a court will on occasion give consideration to other factors in deciding a question of choice of law.").

17

Again, when one looks at the two possible sources of state law offered by the parties, the scale tips decidedly toward Virginia. First, again, no West Virginia citizen is involved in this action, but a Virginia citizen was its root cause. Second, the policy of insurance that results in Scottsdale's potential liability to that Virginia insured, and perhaps the New York plaintiff, has no connection with West Virginia, but a substantial link to Virginia. Third, but for the policy, there would have been no coverage for Sandcastle's default and hence no WVUTPA claim. This purposeful commercial relationship between Scottsdale and Sandcastle, in comparison with the fortuitous nature of plaintiff's and Scottsdale's meeting in West Virginia, is entitled to significant weight. Moreover, the claim of the New York plaintiff here is that of an unrelated third party rather than one by a first party insured against his own foreign-based insurer.

Based upon the foregoing, the section 145 contacts and the section 6 factors weigh in favor of applying Virginia law to any claim of insurer malfeasance. Inasmuch as Virginia law does not provide a statutory avenue for the relief sought by plaintiff, plaintiff's claim for insurer malfeasance is subject to dismissal as a matter of law.

18

The court, accordingly, ORDERS that Scottsdale's renewed motion for the application of Virginia substantive law be, and it hereby is, granted as moulded.

### III.

Based upon the foregoing analysis, the court ORDERS as follows:

1. That Scottsdale's renewed motion for the application of Virginia substantive law be, and it hereby is, granted in part, as to plaintiff's WVUTPA claim; and

2. That the same motion as it concerns the applicable law for coverage issues be, and it hereby is, denied without prejudice.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: April 11, 2006

John T. Copenhaver, Jr.
United States District Judge