UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

M & S PARTNERS,

    Plaintiff

v.                            Civil Action No. 2:04-1221

SCOTTSDALE INSURANCE COMPANY,
an Ohio corporation,

    Defendant

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is a motion for summary judgment filed October 30, 2006, by plaintiff, M & S Partners.

I.

Plaintiff is a New York partnership whose members reside within that state.  (Compl. ¶ 1).  Scottsdale is an Ohio corporation.  (<u>Id.</u> ¶ 2.)  This matter arises from an underlying action previously filed in this court on October 19, 2000.  <u>M & S Partners v. Sandcastle Corp.</u>, 2:00-0981 (S.D. W. Va.) ("underlying action").  The three-count complaint in the underlying action alleged a breach of contract claim against Sandcastle and claims for fraudulent inducement and fraud against P.K. Spencer, its one-time president.  The complaint also pled a separate, fourth "claim" entitled "PIERCING THE CORPORATE

VEIL[,]" which provided materially as follows:

>48.  Upon information and belief, P.K. Spencer, as the
>principal shareholder actively participated in the
>operation of . . . [Sandcastle Corporation, d/b/a
>Southern Security System ("Sandcastle")] such that
>there existed a unity of interest and ownership
>that the separate personalities of the corporation
>and of P.K. Spencer no longer existed.
>
>. . . .
>
>51.  Given . . . [Sandcastle's] cessation of business,
>an inequitable result would occur if the acts
>complained of in this Complaint were treated as
>those of . . . [Sandcastle] alone, thus depriving
>M & S of any meaningful recourse for the breach of
>contract/false and fraudulent representations of
>P.K. Spencer.
>
>52.  As a result of the breach of contract and/or the
>false and fraudulent representations described
>above, M&S has suffered damages.
>
>53.  The conduct of Defendant P.K Spencer, as described
>in this Complaint, was willful, intentional, and
>in reckless disregard of M&S's rights and the
>consequences that it might suffer.  As  a result,
>M&S is entitled to an award of exemplary damages.
>
>WHEREFORE, M&S respectfully prays this Honorable Court
>enter judgment in favor of M&S and against the
>defendants jointly and severally for $181,382.76 in
>compensatory damages, incidental damages in an amount
>to be proven at trial, and $1,000,000.00 in punitive
>damages . . . .

(Underlying action compl. ¶¶ 48, 51-WHEREFORE clause).

The underlying action apparently arose out of two

Residential Monitoring Receivable Financing Agreements

("Financing Agreements").  (Underlying action compl. ¶ 8).  The

2

Financing Agreements were entered into between plaintiff and Sandcastle, a now defunct Virginia corporation.  (Compl. ¶ 5); (Underlying action compl. ¶ 8).  Sandcastle ultimately defaulted on its repayment obligation under the Financing Agreements. (Compl. ¶ 8); (Underlying action compl. ¶¶ 20-23).  One additional component of the underlying action was that, at the time the Financing Agreements were entered, Sandcastle promised that it did not have any claims then pending against it that might result in liability greater than $10,000.  (Underlying action compl. ¶ 10).  In actuality, however, Sandcastle was being sued at the time in the Circuit Court of Kanawha County by Judy's Locksmiths, Inc., for in excess of that amount.  (Id. ¶¶ 11-12).

When the underlying action was instituted, Sandcastle was insured by Scottsdale under a commercial general liability policy ("CGL Policy").  (Def.'s Sept. 6, 2005, Memo. in Supp. at 2).  The claims initially set forth in the complaint were for actions that were, according to Scottsdale, "deliberate or willful in nature."  (Id.)  Scottsdale denied coverage as a result.[1]  (Id.)

---

[1] Sandcastle was originally represented by counsel.  (See Defs.' Ans. at 6).  On May 17, 2001, the court permitted counsel to withdraw, with notice to the acting corporate officers.

On July 17, 2001, after coverage was denied, the court permitted plaintiff to amend its complaint.   The amended complaint alleged the same breach of contract action originally pled against Sandcastle, the same fraudulent inducement and fraud claims against Spencer, the same veil-piercing allegations, with additional reference to the newly added defendants, and new, negligence-based claims against Spencer, Ferrell Lloyd, and John Ross.  Plaintiff never effectuated personal service upon Ross. On May 24, 2002, plaintiff voluntarily dismissed Lloyd from the underlying action.  On May 28, 2002, the court entered the pretrial order, which was prepared and presented by and indorsed with the signatures of counsel for each M & S and Spencer.  On June 11, 2002, plaintiff voluntarily dismissed Spencer, leaving Sandcastle as the lone defendant.

The pretrial order governed the remainder of the underlying action.[2]  In the pretrial order, plaintiff stated in

_____

[2]The foremost commentators on the Federal Rules of Civil Procedure describe the overarching impact achieved by entry of a pretrial order:

> [T]he pretrial order <u>is treated as superseding the pleadings and establishing the issues to be considered at trial</u>.  In this way Rule 16 helps to remove extraneous disputes from the case and serves to expedite the determination of the merits, thereby saving time and expense for the litigants and easing
> (continued...)

4

its entirety as follows with respect to its claim against

Sandcastle:

> (1) <u>Elements which must be proven against . . . Defendant [Sandcastle]</u>
>
> Necessary elements of proof that defendant breached contractual obligations:
>
>> (I)     that a legal, binding contractual agreement existed by and between the parties;
>>
>> (ii)    that the defendant breached the agreement by failing to fulfill and/or perform his/her legal, contractual obligations; and
>>
>> (iii)   the amount of the damages actually suffered by the plaintiff as a result [of] the defendant's breach.

(Integ. Pretr. Order ¶ 3).


On June 6, 2002, inasmuch as Sandcastle had not answered the amended complaint, plaintiff moved for default judgment.  The motion sought only contract damages from Sandcastle arising out of its breach of the two Financing

---

²(...continued)
the burden on the courts by facilitating the handling of congested dockets.

6A Charles A. Wright <u>et al.</u>, <u>Federal Practice and Procedure</u> § 1522 (1990) (emphasis supplied).  Our court of appeals accords similar weight and effect to this important document.  <u>McLean Contracting Co. v. Waterman Steamship Corp.</u>, 277 F.3d 477, 480 (4th Cir. 2002) ("Failure to identify a legal issue worthy of trial in the . . . pretrial order waives the party's right to have that issue tried.").

5

Agreements.  On June 11, 2002, Timothy McGinn, a partner in plaintiff, filed an affidavit itemizing the damages sought from Sandcastle "[a]s a result of . . . [Sandcastle's] breach of its contractual obligations under the Agreement[s] . . . ."  (Aff. of Timothy McGinn ¶ 8).

On June 17, 2002, the date set for trial, Sandcastle failed to appear.  The court conducted a hearing on the motion for default judgment that same day.  On October 3, 2003, the court entered default judgment in favor of plaintiff and against Sandcastle, finding pertinently as follows:

> At the hearing on June 17, 2002, McGinn testified regarding damages M & S has incurred as a result of Sandcastle's default on its contractual obligations.  He further testified that, as of June 1, 2002, the total amount owed by Sandcastle under the . . . [Financing Agreements] was . . . . $508,054.93 . . . .
>
> The court adopts and makes as its findings of fact all of those statements hereinabove attributed to McGinn, whether taken from the affidavit or his testimony, and as otherwise set forth herein.
>
> The court concludes that Sandcastle breached its agreements with M & S as follows: (1) Sandcastle assumed certain obligations under the . . . [Financing Agreements], including the duty to make the prescribed monthly payments to M & S; (2) Sandcastle has failed to perform those contractual obligations, without legal excuse; and (3) M & S suffered actual damages in the amount of $508,054.93 as a result of Sandcastle's failure to perform those obligations. . . .

M & S Partners v. Sandcastle Corp., 2:00-0981 (S.D. W. Va. Oct. 3, 2003).

On October 1, 2004, plaintiff instituted this action in the Circuit Court of Kanawha County.  (Compl.)  The complaint makes the following allegation:

> 11.  Although its insured's liability to M & S was manifest and coverage under the CGL policy readily apparent, Scottsdale engaged in unfair claim settlement practices within the meaning of . . . West Virginia's Unfair Trade Practices Act [(WVUTPA)]. . . and the rules and regulations promulgated thereunder, violating the specific provisions of W. Va. Code § 33-11-4(9).

(Id. ¶ 11).  On November 12, 2004, Scottsdale removed.  On August 24, 2005, the court granted the parties' "joint motion to amend case management protocol."  M & S Partners v. Scottsdale Ins. Co., No. 2:04-1221, slip op. at 1 (S.D. W. Va. Aug. 24, 2005). The referenced order provided pertinently as follows:

> That plaintiff's complaint . . . is . . . construed as asserting from the date of filing (1) a claim against defendant pursuant to Robinson v. Cabell Huntington Hosp., Inc., 201 W. Va. 455, 498 S.E.2d 27, (1997), to recover the amount of the default judgment in M & S Partners v. Sandcastle Corp., No. 2:00-0981 (S.D. W. Va. Oct. 3, 2003); and (2) a claim against defendant for unfair insurance claim settlement practices pursuant to the West Virginia Unfair Trade Practices Act . . . .

Id. slip op. at 1-2.[3]

---

[3]The Robinson claim appears to be based upon that decision's recognition of the following rule:

> In West Virginia . . . there are circumstances in which an injured plaintiff can bring a direct action against a liability insurer. . . . [T]his Court [has] stated
> (continued...)

7

Scottsdale contended that Virginia law governed all
questions relating to both coverage and insurer malfeasance.  On
April 11, 2006, the court concluded that Virginia law applied to
the insurer malfeasance claim, resulting in dismissal of that
cause of action inasmuch as Virginia provides no avenue for
asserting such a claim.  The court did not resolve the choice-of-
law issue relating to the coverage claim inasmuch as the issue
was not properly joined by the parties.

Although plaintiff reserves its right to appeal the
choice-of-law ruling, it concedes that the same sovereign's law
should apply to both claims.  It has thus sought to demonstrate
in its briefing that the application of Virginia law results in
judgment as a matter of law on the coverage claim that remains.
Assuming the presence of an actual conflict between the law of
Virginia and West Virginia on that point, the court observes that
the applicable CGL Policy was (1) formed and entered into in

---

[3](...continued)
'[i]f an insured with coverage under a liability
insurance policy does not pay the underlying judgment
entered in a personal injury action, the injured
plaintiff may institute a direct action against the
insurance company to recover the amount of the judgment
up to the limits of the policy.'

Robinson, 201 W. Va. at 460, 498 S.E.2d at 32 (citation omitted).

8

Virginia with the assistance of Sandcastle's insurance agent, and
(2) delivered to Sandcastle in Virginia, where it was domiciled.
Additionally, Sandcastle never suggested to Scottsdale that it
conducted business in West Virginia, and the policy was to be
performed in Virginia.  To the extent a choice is necessary,
Virginia law is deemed to apply to the coverage claim.


II.


A.   The Summary Judgment Standard


        A party is entitled to summary judgment "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Material facts are those necessary to
establish the elements of a party's cause of action.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

        A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a
light most favorable to the non-moving party, a reasonable fact-

9

finder could return a verdict for the non-movant. <u>Id.</u>  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); <u>Id.</u> at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  <u>Overstreet v. Kentucky Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party

10

opposing the motion is entitled to have his or her version of the
facts accepted as true and, moreover, to have all internal
conflicts resolved in his or her favor.  <u>Charbonnages de France
v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are
"drawn from the underlying facts    . . . must be viewed in the
light most favorable to the party opposing the motion."  <u>United
States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B.   Analysis

       When an insurance policy is clear and unambiguous,
courts must accord the language chosen its plain and ordinary
meaning and enforce the policy as written.  <u>Transcontinental Ins.
Co. v. RBMW, Inc.</u>, 262 Va. 502, 512, 551, 551 S.E.2d 313 (Va.
2001); <u>Schneider v. Continental Cas. Co.</u>, 989 F.2d 728, 733 (4th
Cir. 1993).  In sum, "it is not a court's function to make a new
contract for the parties different from that plainly intended and
thus create a liability not assumed by the insurer."  <u>Fed. Ins.
Co. v. New Coal Co.</u>, 415 F. Supp.2d 647, 651 (W.D. Va. 2006)
(citing <u>Blue Cross & Blue Shield v. Keller</u>, 248 Va. 618, 450
S.E.2d 136 (Va. 1994)) (internal quotations omitted)).

       As Scottsdale rightly observes, '[t]he issue . . .is
whether insurance coverage exists for [the] breach of contract

11

claims asserted against . . . Sandcastle . . . ."  (Def.'s Memo. of Law in Resp. at 1).  Although plaintiff contends the default judgment order "decreed . . . [Scottsdale] liable for negligence on two theories[,]" the basis for such a conclusion is nowhere identified.  (Pl.'s Reply at 1).  Plaintiff has likewise referenced no language in the CGL Policy that provides coverage for breach of contract claims.  Indeed, plaintiff "concede[s] that there is no coverage under the CGL Policy for breach of contract, liability resulting therefrom, or for any intentional act on the part of Sandcastle or its principals."  (Id. at 2).

The basis for the default judgment order was Sandcastle's breach of the Financing Agreements.  Sandcastle bargained for a CGL Policy rather than a general contract of suretyship.  Further, plaintiff can claim no greater rights under the CGL Policy than those possessed by the signatory Sandcastle. The court, accordingly, concludes Scottsdale has no obligation to indemnify Sandcastle, or compensate plaintiff, for the liability imposed by the default judgment order.[4]

---

[4]The court observes it would have been the wiser course for Scottsdale to have timely obtained a judicial declaration concerning its defense and indemnification obligations.  Its failure to do so, however, does not redound to the benefit of Sandcastle or plaintiff.  The CGL Policy does not disclose an indemnification obligation under the present circumstances.

12

Plaintiff attempts to avoid this result with several arguments.  First, plaintiff relies upon the following "Errors and Omissions Extension" found in the CGL Policy:

> In consideration of the premium charged at inception, and subject to the conditions and exclusions in the coverage form, it is agreed that coverage afforded by this endorsement shall apply to sums which <u>you shall become legally obligated to pay because of any negligent act, error or omission committed during the policy period in the conduct of the operations shown above</u>, whether committed by you or by any person for whom you are legally responsible.

(Ex. B at 25, Pl.'s Mot. Summ. J. (emphasis supplied)).  The emphasized language presupposes a negligent act that results in the insured's legal obligation to pay.  Inasmuch as Sandcastle is legally obligated to pay plaintiff damages arising out of its breach of the Financing Agreements, the Errors and Omissions Extension has no application.

Second, plaintiff notes that Scottsdale defended and indemnified Sandcastle in the aforementioned Judy's Locksmiths' case in the Circuit Court of Kanawha County.  Plaintiff contends Scottsdale did so despite the fact Sandcastle was alleged only to have engaged in conversion and fraud.  The operative consideration presently, however, is not whether Scottsdale has a gratuitous obligation to provide coverage to Sandcastle for the default judgment, but rather whether the CGL Policy imposes such a duty.  As noted, no such duty is present

13

Third, plaintiff makes much of the amended complaint's negligence claims against Spencer, Lloyd, and Ross, each of whom may have qualified as agents of the entity.  Neither Ross nor Lloyd ever tendered their defense to Scottsdale.[5]  Further, each of the individual defendants, along with the claims alleged against them, were dismissed from this action prior to trial. Additionally, the only claim upon which the court entered judgment was plaintiff's claim for breach of contract against Sandcastle.

Fourth, in a somewhat related vein, plaintiff appears to suggest that Scottsdale caused the default of Sandcastle because the insurer did not appear timely to defend the negligence allegations contained within the amended complaint. Two considerations overcome the argument.  Initially, plaintiff has identified no provision in the CGL Policy which accords it standing to challenge Scottsdale's decision not to defend Sandcastle.

_____

[5]Had they done so, Scottsdale observes "they likely would have been recognized as insureds in their respective capacities as executive officers of Sandcastle."  (Def.'s Memo. of Law in Resp. at 2).

14

That issue aside, however, plaintiff's argument appears to presume that negligence claims were pled against the corporate entity.  The court notes its observation in dicta in a brief footnote in its default judgment order that Sandcastle "made negligent misrepresentations by failing to disclose" the Judy's Locksmiths' action and "negligently supervised its [Sandcastle's] agent Spencer . . . ."    M & S Partners v. Sandcastle Corp., 2:00-0981 (S.D. W. Va. Oct. 3, 2003).  Upon being squarely confronted with that issue now, however, Scottsdale's initial reading of the amended complaint was both objectively correct and, additionally, conclusively proven up by subsequent events in the underlying action.  A careful reading of the operative pleadings in the underlying action discloses that Sandcastle was sued only for breach of contract.  Additionally, entry of the superseding pretrial order practically robbed the amended pleading of any further effect.

While plaintiff attempts a post hoc, notice-pleading argument to somehow gain coverage by capturing Sandcastle in its capacity as principal for the individual defendants, plaintiff's contrary, original intentions are again confirmed by how it subsequently cast its theory against Sandcastle in the pretrial order entered in the underlying action.  Had plaintiff desired to

15

pursue any extant negligence claims against Sandcastle after
voluntarily dismissing its individual, corporate agents who were
targeted by those claims, one would have expected the negligence
claims to appear in the all-encompassing pretrial order or to
have at least been added by amendment of that critical document
after the last corporate-agent defendant, Spencer, was
voluntarily dismissed.  As noted, only a breach of contract claim
was pursued against Sandcastle in the pretrial order, leading one
to the ineluctable conclusion that this non-covered claim was the
only one for which plaintiff ever sought to hold Sandcastle
accountable from the outset.[6]  If plaintiff had in mind all along
to hold Sandcastle liable as a principal for its agents'
negligence, why would it have voluntarily abandoned those covered
claims at a time when default judgment seemed near certain?  As
noted, the default judgment order extended only to judgment on
that singular theory for which coverage is not indicated.  There
is simply no claim sounding in negligence that plaintiff pled
against Sandcastle, either directly or indirectly, or upon which
it obtained judgment.

---

[6]Plaintiff has not challenged Scottsdale's contention that
"the evidence presented by the Plaintiff during the June 17, 2002
hearing was limited to establishing a default by Sandcastle on
the" Financing Agreements.  (Def.'s Memo. of Law in Resp. at 8).

Based upon the foregoing analysis, the court ORDERS that plaintiff's motion for summary judgment be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: January 4, 2007

John T. Copenhaver, Jr.
United States District Judge

17